FC



FILED

7/1/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

DJ

RECEIVED

JUN 3 0 2025 Jxm

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JULIUS WILLIAMS | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
| FAMILY DOLLAR STORES, LLC | ) | **1:25-cv-07348** |
| FAMILY DOLLAR, LLC, | ) | **Judge LaShonda A. Hunt** |
| DOLLAR TREE, INC. | ) | **Magistrate Laura K. McNally** |
| Defendants. | ) | **RANDOM/CAT. 2** |

## COMPLAINT

Plaintiff JULIUS WILLIAMS alleges as follows:

1.      This case, is an attempt at forming a more perfect society, brings renewed attention to the persistent issue of discrimination in consumer commerce. America has a long history of civil rights challenges and undeniable progress, yet the remnants of systemic bias remain—particularly in the form of consumer profiling based on race and other protected characteristics. This practice, often subtle but deeply entrenched, manifests in retail settings where individuals, particularly the marginalized, are disproportionately surveilled, suspected, or denied equal treatment.

> *"There are very few African American men in this country who haven't had the experience of being followed when they are shopping in a department store. That includes me."*
>
> *—President Barack Obama, Remarks by the U.S. President on Trayvon Martin,*
> *The White House (July 19, 2013)*

2. Consumer profiling is not merely an inconvenience; it functions on multiple levels of harm—psychological, social, and economic. It causes emotional distress, reinforces racial stigmas, deters equitable participation in commerce, and undermines the constitutional principles of equal protection and human dignity. Businesses often enjoy a more protected and entrenched status within the community, sometimes backed by the state, which makes it particularly egregious when they, through bias and prejudice, violate the civil rights of individuals. Moreover, this initial wrongdoing frequently triggers a chain of events that primes the aggrieved party for further civil rights violations, particularly in the realm of public accommodations, often at the hands of state actors. The business, leveraging its perceived credibility as a community institution, may present the individual to law enforcement as a bad actor—citing trespass or other allegations stemming from a conflict that originated in discriminatory consumer profiling based on stereotype and bias. Marginalized populations—particularly Black, Brown, and disabled individuals—who are most often subjected to such profiling, are thereby placed in statistically greater danger during encounters with police, especially in the context of use of force.[1] What may appear as a minor commercial slight thus becomes the catalyst for profound and potentially life-threatening harm. The continued prevalence of these practices necessitates both legal accountability and cultural reform if we are to make meaningful progress toward a more just and inclusive society.

3. This civil action is the result of Family Dollar's unlawful use of purportedly neutral business policy, namely, " **Bookbag Policy** (for Certain Patrons)" as a pretext for racial

---

[1] See Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of being killed by police use of force in the United States by age, race–ethnicity, and sex*, 116 Proc. Nat'l Acad. Sci. 16793 (2019), https://www.pnas.org/doi/pdf/10.1073/pnas.1821204116; see also Jon Swaine et al., *Black Americans twice as likely as whites to face use or threat of force*, The Guardian (Nov. 14, 2015), https://www.theguardian.com/us-news/2015/nov/14/black-americans-twice-as-likely-as-whites-to-face-use-or-threat-non-fatal-police-force-us-study.

and other protected class discrimination, profiling, interfering with the ability of protected classes to make a contract, and denial of public accommodation—conduct that violates both federal and state civil and human rights laws. At its core, this case seeks redress for discriminatory treatment disguised under the veil of standard procedure, and for the enduring harm such treatment inflicts on the dignity, safety, wellbeing and civil liberties of an individual—particularly but not limited to those from historically marginalized communities. Plaintiff himself was victimized and so brings this action in hopes of holding Family Dollar accountable for the injuries he suffered, and to send a message to the business community that strong and powerful companies will not be allowed to intentionally discriminate against its most vulnerable populations.[2]

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a), 42 U.S.C. § 1981, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

5.      This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Upon administrative exhaustion, Plaintiff will seek leave to amend this Complaint to include a claim

---

[2] https://www.washingtonpost.com/news/get-there/wp/2018/05/17/shopping-while-black-african-americans-continue-to-face-retail-racism/

3

under the Illinois Human Rights Act, which will likewise fall within the Court's supplemental
jurisdiction under 28 U.S.C. § 1367.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because
a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred within
the Northern District of Illinois and the city (Calumet City), including the acts of discrimination
and denial of public accommodation described herein occurred within this district. On
information and belief, Dollar Tree, Inc.—the parent corporation of Family Dollar, LLC and
Family Dollar Stores, LLC—is presently engaged in efforts to divest Family Dollar to a private
equity firm(s). Plaintiff alleges that such a transaction poses a substantial risk of asset
dissipation or corporate restructuring that may frustrate the Court's ability to grant full and
effective relief, including monetary and injunctive remedies. Dollar Tree, Inc. is therefore
named as a Defendant for purposes of securing equitable relief to preserve the status quo during
the pendency of this litigation.

## PARTIES

*Plaintiff*

7. **Plaintiff Julius Williams Pro Se Litigant** and an African American male
residing in Illinois and a citizen of the United States. At all relevant times, Plaintiff was a
customer at a Family Dollar retail store located at 1775 Sibley Blvd, Calumet City, Illinois, and
was subjected to the discriminatory treatment, denial of public accommodation, and interference
with contractual relations as described herein. Plaintiff is a person with a disability within the
meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102, namely, "anxiety."
The Plaintiff carried in his backpack comfort items to manage his anxiety peradventure he

4

became beset by an anxious episode. However, the Plaintiff was denied full and equal enjoyment of the goods, services, facilities, and privileges of the public accommodation operated by Defendants because of his disability and Defendants' failure to provide reasonable accommodations. Plaintiff is also a member of protected classes based on race, color, and sex, and was targeted, profiled, and discriminated against on the basis of his race, color, and disability in violation of federal and state civil and human rights laws. Plaintiff's claim of sex and other protected class discrimination under the Illinois Human Rights Act will be added upon exhaustion of administrative remedies.

### *Defendants*

8.      Defendant FAMILY DOLLAR STORES, LLC is a Delaware limited liability company with its principal place of business in Chesapeake, Virginia. It operates retail discount stores across the United States, including in the State of Illinois, and is engaged in interstate commerce.

9.      Defendant FAMILY DOLLAR, LLC is an affiliated entity of Family Dollar Stores, LLC, with overlapping management and operational control over store policies and customer service procedures, including the locations relevant to this action. It operates and maintains the Family Dollar store located at 1775 Sibley Blvd, Calumet City, Illinois, where the discriminatory conduct at issue occurred.

10.     Defendant DOLLAR TREE, INC. is a publicly traded corporation incorporated in Virginia with its principal place of business in Chesapeake, Virginia. Dollar Tree, Inc. is the ultimate parent company and sole owner of both Family Dollar, LLC and Family Dollar Stores, LLC. Dollar Tree, Inc is named solely for the purpose of obtaining injunctive and equitable relief

5

in connection with its ongoing efforts to divest Family Dollar to a private equity firm, which may result in the dissipation of assets or dissolution of Family Dollar, thereby undermining the enforceability of any judgment in this case. Dollar Tree exercises operational and financial control over Family Dollar and is a necessary party for equitable relief.

On or about MARCH 25TH 2025 OR "recently announced" if undetermined, Dollar Tree publicly disclosed definitive plans to the sale or divestiture of Family Dollar Stores, LLC, as reflected in its 2024 Annual Report filed with the Securities and Exchange Commission (SEC). This contemplated corporate transaction could have the effect of dissipating or encumbering assets, limiting Plaintiff's ability to obtain meaningful relief, and may place Family Dollar Stores, LLC beyond the effective jurisdiction of this Court or render it insolvent or judgment-proof. Given these circumstances and Dollar Tree, Inc.'s direct role in controlling and benefiting from the alleged discriminatory policies, its inclusion as a Defendant is necessary to ensure full accountability and to preserve the Court's ability to render effective equitable relief, including a temporary restraining order and/or preliminary injunction preventing the consummation of the divestiture or sale of Family Dollar Stores, LLC until the rights of the Plaintiff and the legal issues raised herein are fully adjudicated.

## FACTS

I.      **Introduction of the Plaintiff and his engagement and familiarity with the Defendant Family Dollar.**

11.     Plaintiff Julius Williams is a longtime member of the Calumet City community, having first moved to the area in 2001 as a young man. Over the years, he has intermittently resided in Calumet City and has frequently returned to visit family. During this time, whether as a resident or visitor, Mr. Williams has periodically patronized the Family Dollar store located at 1775 Sibley Boulevard in Calumet City, Cook County, Illinois. Although not aways a daily or

6

weekly shopper, his visits were regular enough over time to become familiar with the store's environment, practices, and customer service patterns.

(A).    Notably, on multiple occasions prior to the incident on March 8, 2025, Mr. Williams observed that individuals of various races—other than Black or dark-skinned males and females—were permitted to shop while wearing backpacks or bookbags on their person without being instructed to check or surrender them as a condition of entry or service. These patrons surely enjoyed full and unrestricted access to the store and its merchandise, including the right to shop and complete purchases without interference or having to surrender or check their bookbag or backpack.

(B).    In a separate visit prior to the March 8, 2025 incident, Mr. Williams personally witnessed and attests to hearing a Family Dollar cashier remark to another employee, stating, "the store had been robbed in the fall of 2019 by a Black guy and it be darkskin people like us that you have to watch, I don't care, I be on them when they come in here." These experiences informed Mr. Williams's growing concerns about the pattern of selective enforcement and disparate treatment, as he increasingly felt surveilled, followed, or otherwise singled out while present at this location.

## II.    March 8, 2025 Incident: Plaintiff Subjected to Discriminatory Enforcement of Family Dollar's Pretextual 'No Bookbag/Backpack' Policy Resulting in Unlawful Trespass"

12.    On March 8, 2025, the Plaintiff, Julius Williams, walked to the Family Dollar store located at 1775 Sibley Boulevard in Calumet City, Illinois, for the purpose of purchasing

necessary items in preparation for a religious event. While walking and upon entering the store, the Plaintiff was listening to a sermon through headphones at a low volume, which did not impair his awareness of his surroundings. Immediately upon entering, the Plaintiff observed intense and prolonged stares from Family Dollar employees—so piercing and dehumanizing that he momentarily questioned whether someone had addressed him. However, there had been no verbal communication at that point. The Plaintiff, who has endured such encounters before, immediately recognized the familiar and unsettling look of suspicion, and even fear, directed toward him—an experience that is all too recognizable for those who have repeatedly been subjected to such treatment. As the Plaintiff walked further into the store, he was abruptly met with an arbitrary condition imposed upon him by a Family Dollar cashier, who stated, "you got to take off your bag." The Plaintiff, having previously observed that this policy was not enforced upon similarly situated non-Black or non-dark-skinned patrons, understood that he was being singled out based on bias and preconceived suspicion. Moreover, the Plaintiff's backpack contained his valuable laptop and personal comfort items used to manage anxiety. With this in mind, and recalling a prior visit during which a cashier had made a biased remark referencing Black individuals—specifically stating, "the store had been robbed in the fall of 2019 by a Black guy and it be darkskin people like us that you have to watch"—the Plaintiff replied in form and substance, "I am not taking my backpack off... you have to apply that condition on everyone not just me." In response, the cashier insisted that the Plaintiff had to leave. The Plaintiff, attempting to appeal to reason and fairness, responded in sum and substance, "I am not a thief." The cashier refused to rescind the condition, again stating that the Plaintiff must leave. The Plaintiff then stated, "then you can call the police," and began to walk away, disoriented and hurt by the

experience of being unfairly profiled and singled out. As the Plaintiff exited the store, the Family Dollar cashier called the police.

13.     After leaving the store, the Plaintiff felt deeply upset, humiliated, and emotionally distressed, experiencing a wave of stress and anxiety in anticipation of the impending police interaction. The Plaintiff seriously contemplated remaining silent about the denial of public accommodation and the humiliation suffered, fearing the possibility of being mistreated or wrongfully accused by law enforcement, as had occurred during past unrelated police encounters. Without access to a personal vehicle at the time, the Plaintiff initially considered walking away from the scene. However, the concern arose that if Family Dollar inserted an inaccurate or misleading narrative into the situation, the Plaintiff might be intercepted or confronted by police elsewhere, possibly under more dangerous or prejudicial circumstances. This fear induced a physiological response—his thumb began to twitch, followed by noticeable shaking in his hand, accompanied by a spike in heart rate, consistent with anxiety symptoms. To regain composure, the Plaintiff reached into his backpack, took a sip of water, and read a brief passage from a book he carries on "overcoming anxiety." After calming himself, the Plaintiff made the deliberate decision to contact the police, assert his account of what had transpired, and wait calmly for officers to arrive in order to provide a truthful and measured account of the discriminatory treatment he endured.

14.     Shortly thereafter, a marked Calumet City Police Department unit arrived in response to the call. Plaintiff observed the officer, later identified as Officer Bustos, park his vehicle in the Family Dollar parking lot. The Plaintiff waived down Officer Bustos, who approached with his body-worn camera fully activated. The body-worn camera recorded the full exchange between Plaintiff and Officer Bustos, as well as police interactions with Defendant's employee. The video

9

provides direct evidence of the events at issue. A true and correct copy is attached as **Exhibit A**, with a transcript as **Exhibit B**.

15.    The Plaintiff explained in full what had occurred inside the Family Dollar store—that he had been denied public accommodation after refusing to comply with an arbitrarily and discriminatorily applied backpack policy, and that he was subsequently trespassed without cause. Officer Bustos listened attentively and then proceeded into the Family Dollar store to obtain the staff's version of events.

16.    Upon speaking with the cashier, the officer learned that the cashier did not enforce the alleged policy uniformly. The cashier admitted that the so-called bookbag or backpack policy was not applied to women, rationalizing that he assumed a woman's bookbag or backpack was being used as a purse. The cashier also confirmed to Officer Bustos that there were no posted signs or notices in the store communicating any such policy to the public. Additionally, the cashier stated that he was not acting solely on his own discretion but instead following his manager's policy.


17.    Significantly, when questioned further—particularly in light of the Plaintiff's earlier assertion that the policy must be applied to everyone equally—the cashier began to hedge, untruthfully claiming that he applies the policy to all customers. However, he simultaneously affirmed that he does not apply it to women who wear bookbags or backpacks while shopping. This inconsistent and selectively enforced practice reflects a pattern wherein similarly situated non-Black men and women were allowed to shop without being required to comply with the policy. The Plaintiff had observed on prior visits to the store—individuals who were permitted to

shop without being subjected to this arbitrary condition or presumed as suspicious though they wore a bookbag or backpack on their person.

18.     The exchange between the Plaintiff and Officer Bustos, as well as the conversation between Officer Bustos and the Family Dollar cashier, are captured on the officer's body-worn camera. Both the footage and the transcript of the bodycam interview are referenced and submitted as exhibits to this Complaint and will confirm, among other points, the following:

(A) The Plaintiff was denied public accommodation on March 8, 2025 and would be told not to return.

(B) The Family Dollar cashier acknowledged that the policy was selectively enforced at least based on gender;

(C) There was no visible or posted notice of the alleged backpack policy within the store at the time of the incident.

(D) The Family Dollar Cashier stated that the No Backpack policy was his manager's policy.

### III.     Mystery Shopper Investigation Reveals Discriminatory and Uneven Enforcement of Family Dollar's Unposted No Bookbag/Backpack Policy

#### 1.     *(Description of Mystery Shop Investigation)*

19.     Following the March 8, 2025 incident at Family Dollar, the Plaintiff, Julius Williams, conducted and oversaw an independent investigation to evaluate the store's "Bookbag/Backpack" policy. The investigation involved a coordinated series of mystery shopper visits to the Family Dollar located at 1775 Sibley Boulevard, Calumet City, Illinois. This

11

investigation was carried out to determine whether the policy was being applied consistently and without discrimination based on race, color, sex. A total of five individuals participated as mystery shoppers: three men of varying racial and ethnic backgrounds (African American, Mongolian, and Indian) and two White women. Each participant was equipped with a visible bookbag or backpack and instructed to enter the store and attempt to shop while wearing it.

20.     The mystery shops were recorded on video as each shopper entered and exited the store. Upon completing their shop, each participant was asked to complete a standardized questionnaire describing their experience, which was signed and notarized in the Plaintiff's presence. The mystery shoppers were instructed to answer the questionnaire truthfully and accurately based on their individual experiences. True and correct copies of the videos and signed questionnaires are attached hereto as **Exhibits C, D, E, F,G,H,I,J,K, & L**. Personal identification numbers contained within these exhibits have been redacted pursuant to Fed. R. Civ. P. 5.2.

### 2.     *(Principles and Controls Ensuring Integrity of the Mystery Shop Process)*

21.     To preserve the objectivity and integrity of the investigation, the following controls were implemented by the Plaintiff:

(A).     No Coaching on Expected Outcome: Mystery shoppers were not informed of any particular result or discriminatory pattern the Plaintiff may have suspected. They were only informed that the investigation focused on customer experience related to the store's treatment of patrons wearing bookbags or backpacks.

(B).    Standardized Orientation: Each mystery shopper was provided a brief orientation informing them they would be shopping at the designated Family Dollar location while wearing a backpack and would be filmed entering and exiting the premises.

(C).    Truthfulness and Accuracy Encouraged: Mystery shoppers were explicitly instructed to complete their post-shop questionnaire/affidavit truthfully and without influence.

(D).    Compensation Independent of Outcome: Each participant was paid a flat fee of $50 for their time, regardless of how they responded in the post-shop affidavit or what experience they reported. In some cases, additional gas compensation was provided based solely on distance traveled to the site, not on the content of their reports.

(E).    Notarization of Results: All completed mystery shopper questionnaires were signed in the presence of a notary public, who notarized their signatures, thereby affirming the authenticity of their statements.


3.    *(Summary of Results of Mystery Shop Investigation)*

22.    The results of the mystery shopper investigation yielded clear evidence that the Family Dollar store located at 1775 Sibley Boulevard did not apply the "Bookbag or Backpack" policy in a universal or equitable manner. Notably:

(A).    Both female mystery shoppers—one who identified as White and Asian (Filipina), and the other who identified as White and Brazilian—were permitted to shop while wearing their bookbags or backpacks without objection or intervention from store employees. Exhibits (I ,J, K & L)

13

(B).    Among the male mystery shoppers:

      i.    The Asian (Mongolian) man—who had the lightest skin tone—was allowed to shop without incident while wearing his backpack. Exhibits (E &F)

      ii.    The Indian man—who was darker than the Mongolian man but lighter than the African American participant—was told to remove his backpack or leave the store. Exhibits (G & H)

      iii.    The African American man—who had the darkest complexion among the male participants—was similarly denied public accommodation unless he surrendered his backpack, mirroring the Plaintiff's own experience on March 8, 2025. Exhibits (C&D)

23.    Moreover, during each mystery shop visit, no signs, postings, or visible public notices were present in the store to inform customers of any formal policy prohibiting backpacks or bookbags. These findings reinforce the Plaintiff's position that the alleged policy is enforced arbitrarily and discriminatorily, often under pretext, and that it disproportionately targets individuals based on race, color, sex, and appearance.

## IV.    Family Dollar's History, Prior Knowledge and Negligent Supervision Regarding Discriminatory Bag Search Practices and Bookbag Policy.

### 1.    Family Dollar's History of Racially Targeted Bag Search Practices

24.    Family Dollar should have been acutely aware of the controversies and legal challenges arising from its bag-search and bookbag policies, especially where such practices intersected with claims of racial discrimination. The *Des Moines Iowa Civil & Human Rights Commission* reached a public settlement with Family Dollar after two Black women were

14

racially profiled and subjected to purse inspections, resulting in an $8,600 payout and mandatory

anti-discrimination training for store personnel.[3] Later according to a Des Moines Iowa City

News Press Release illustrates the settlement was not in the absence of any wrong doing:

**Des Moines, Iowa — Wednesday, July 14, 2021 — On Tuesday July 13, the Des Moines
Civil and Human Rights Commission** *reached a settlement agreement against a national
discount dollar chain store that was found to be racially profiling customers of African descent.
The case involved two African American females who went into the store to shop, but when they
attempted to leave the store, the door was locked, and they were prevented from leaving until
their purse was searched.*

*During that search, management revealed that they were conducting the search in part because
they were Black[4]. The search revealed that nothing was stolen. During the search and
subsequent discussion, the assistant store manager allowed White customers to exit the store
without requiring bag or purse searches.*

*The Des Moines Human Rights Ordinance public accommodation provision prohibits businesses
and organizations that offer their services to the public from discriminating on the basis of race,
which includes racial profiling and false accusations because of the color of the customer's skin.*

25.     While this incident involved purses rather than backpacks, it underscores Family

Dollar's prior exposure to discriminatory enforcement of bag-search policies, evidencing a

corporate tolerance or negligent supervision for practices that disproportionately affect people of

color.

**2. Family Dollar Claim's Regarding their Backpack Policy, "…this policy applies
to all customers…," and Acknowledgement of duty for Corporate Supervision."**

---

[3] https://www.kcci.com/article/settlement-reached-in-lawsuit-over-dsm-family-dollar-discrimination/37029854?

[4] https://www.dsm.city/news_detail_T2_R426.php

26.     This is further echoed in the 2022 Illinois appellate case *Zsoch Dunn v. Illinois Human Rights Commission, 2022 IL App (1st) 211156-U*, in which Family Dollar openly acknowledged the existence of a "bookbag or backpack" policy at some store locations. Family Dollar claimed the policy was universal: "employees ask customers with bags or backpacks to place them behind the register as a loss prevention effort; this policy applies to all customers."

27.     Considering the company's assertion that the policy was uniformly enforced in that specific instance, the very defense underscores that **Family Dollar was aware that any selective or inconsistent application could reasonably trigger consumer complaints of discrimination. That awareness creates a legal and operational duty: the company must adequately supervise and train employees to ensure that such policies are never used as a pretext for racial or other protected class profiling and discrimination.**

28.     Yet—the Plaintiff alleges that he personally witnessed through prior observation, his own experience and subsequent investigation that Family Dollar has negligently failed to supervise and ensure the universal and unbiased application of its bookbag policy on numerous occasions at its store located at 1775 Sibley Blvd in Calumet City. The pattern of selective enforcement of the bookbag policy existed well before the incident on March 8th, 2025 and on that date. This failure occurred with such frequency and consistency that the Plaintiff was able to obtain direct evidence of what he had long observed: a pattern of selective enforcement that disproportionately targeted customers based on race, color, gender and other protected classes.

29.     The absence of any posted notice or public signage explaining the policy further underscores the company's intent to reserve its enforcement as a discretionary tool—one that is quietly wielded against those who become the subject of personal bias or suspicion. And we all know who is most often suspected. Family Dollar maintains this vague and unwritten

16

enforcement mechanism not to protect inventory, but to apply arbitrary scrutiny upon individuals—particularly those with darker skin—under the guise of a neutral rule.

30.     This is not a speculative claim. Family Dollar has a known and documented history of applying "different treatment" to customers of color under the "same policy" framework. A stark example is found in the findings of the Des Moines Civil and Human Rights Commission, where two Black women were unlawfully detained, denied the freedom to leave, and subjected to a degrading and unjustified bag search based on their race. That case reveals what this Plaintiff also experienced: Family Dollar's so-called neutral policies are routinely transformed into instruments of racial profiling and public humiliation when left unsupervised and unregulated.

31.     Additionally, credible online records and complaints suggest this policy has been unevenly enforced across Family Dollar stores, reinforcing the notion that the company knew or should have known that its so-called neutral policy could and was being discriminatorily applied. This is not an exhaustive record of all relevant evidence, but it clearly signals that the issue is discoverable and will likely be further illuminated during litigation. Given this context, it is alleged that Family Dollar's failure to ensure consistent enforcement through proper supervision and anti-discrimination safeguards constitutes negligent supervision under Illinois tort law. The use of the "bookbag" policy without adequate oversight allows implicit or explicit bias to infiltrate customer service practices, violating both public accommodation protections and common law duties to prevent foreseeable harm. It is alleged that this is the same type of harm that Family Dollar's neglect of supervision caused and injured the Plaintiff, Julius Williams, on March 8th, 2025, at its store located at 1775 Sibley Blvd, Calumet City, Illinois. On that date, the Plaintiff was consumer-profiled and subjected to a discriminatory policy that was presented as

17

neutral but in reality, functioned as a pretextual tool of discrimination. As a result, Plaintiff alleges his civil rights were violated under Title II of the Civil Rights Act of 1964, which guarantees equal access to public accommodations; 42 U.S.C. § 1981, which protects the right to make and enforce contracts; Title III of the Americans with Disabilities Act; the Illinois common law tort of negligent supervision; the Illinois intentional infliction of emotional distress doctrine; and the Illinois Human Rights Act.

V.     **FAMILY Dollar Corporate Supervision should Include Training and Monitoring to Prevent Discrimination through Consumer Profiling in Policies and Practices specifically, Bookbag Policy.**

31. Family Dollar, as a national retail chain operating thousands of stores across diverse communities, bears an implied and affirmative duty to implement robust corporate supervision mechanisms that prevent the discriminatory application of store-level policies. This duty is particularly urgent where store policies have the capacity to be enforced in a discretionary manner, such as Family Dollar's alleged "Bookbag" policy.

32. In the absence of visible postings and in light of repeated instances of selective enforcement, Family Dollar must recognize its responsibility to ensure that its policies— especially those related to loss prevention—are applied uniformly to all customers, without regard to race, gender, color, disability, or other protected classes. That responsibility extends to not only monitoring policy enforcement but also to training its employees on the dangers of bias, both explicit and implicit, in public accommodation contexts.

33. Therefore, the Plaintiff alleges Family Dollar must be compelled to implement **Mandatory Consumer Profiling Training and Education**, with specific integration into its "Bookbag or Backpack" policy. This training must stress that the policy is not

merely about loss prevention—it is a customer-facing policy that must be executed equitably, respectfully, and lawfully. It must also serve to safeguard against the use of store policies as tools of arbitrary suspicion or covert discrimination.

34. The Plaintiff proposes that Family Dollar's corporate training and supervision reforms include, at a minimum, the following key elements:

**(A) Mandatory Uniform Enforcement Protocols.**

All employees must be trained on the requirement that any backpack or bookbag policy be applied *uniformly* to all customers, without exception. Employees must be taught that selective enforcement based on appearance, assumptions, or stereo types is unacceptable and exposes the company to liability. This includes consistent enforcement across age, race, gender, disability, or familiarity with the customer.

**(B) Recognition of Explicit and Implicit Bias.**

Training should educate staff on how both conscious (explicit) and unconscious (implicit) biases influence perception and decision-making. Importantly, it must highlight that **bias can exist across demographics as well as within them. For example, while racial bias is often discussed in terms of majority groups targeting minority groups, it is equally critical to acknowledge that individuals may harbor bias toward members of their *own* race or group, as when a Black employee unjustly profiles a Black customer**. This nuance is essential in preventing internalized discrimination or behavior shaped by learned prejudice.

**(C) Anti-Discrimination Warnings Regarding Discretionary Practices.**

Employees must be warned that discretion in applying customer-facing policies like the bookbag rule is dangerous when untethered from objective standards. Discretion opens the door

to disparate treatment, whether intentional or not, and invites public accommodation violations under Title II of the Civil Rights Act and similar laws. Employees should be trained to avoid "personal bias" enforcement unless it is backed by a clear and non-discriminatory basis applicable to all patrons.

### (D) Customer Disability Accommodations.

The training must explicitly cover the importance of accommodating individuals with disabilities who may carry essential medical or comfort items in backpacks. Employees should be instructed to engage sensitively and lawfully with individuals whose backpacks serve a functional, medical, or therapeutic purpose. Blanket application of the policy without reasonable modifications may violate Title III of the Americans with Disabilities Act (ADA).

### (E) Policy Transparency and Public Disclosure.

All stores must visibly post any backpack or bookbag policy at all entrances and in areas where it can be clearly read before entry. Employees must be trained to refer to the posted notice rather than personally confronting patrons without documentation. This reduces discretionary enforcement and enhances both transparency, accountability and human dignity.

### (F) Incident Reporting and Supervisory Oversight.

Supervisors must be required to regularly review enforcement patterns and investigate customer complaints involving perceived profiling. All incidents involving enforcement of the backpack policy should be logged, and stores should implement periodic audits to ensure fairness and consistency.

35. It is alleged that as demonstrated by the Plaintiff's independent investigation and supported by publicly documented cases such as the Des Moines Civil and Human Rights

Commission action, Family Dollar has persistently failed to take these basic supervisory and educational steps. Without the above training elements in place, Family Dollar enables a culture where suspicion disproportionately falls on customers with darker skin —even when store employees themselves may belong to the same racial group. Such conditions are not the product of individual bad actors alone but are indicative of systemic corporate neglect.

36. The Plaintiff therefore alleges that Family Dollar's lack of structured training with efficacy, coupled with its discretionary and unwritten enforcement practices, has directly led to civil rights violations and consumer humiliation. It is imperative that Family Dollar adopt and implement comprehensive consumer profiling training—integrated into all relevant customer-facing policies—to ensure compliance with federal and state civil rights laws and to fulfill its legal and ethical duties of care.

## VI. Plaintiff's Injuries Arising from Family Dollar's Alleged Discriminatory and Unequally Enforced Bookbag Policy as a Result of the Company's Negligent Failure of Corporate Supervision.

37. Plaintiff alleges that Family Dollar's failure to implement proper corporate supervision, training, and enforcement standards surrounding its so-called bookbag policy has resulted in the unlawful targeting and discrimination of Plaintiff Julius Williams. This policy— vague in its articulation, arbitrary in its enforcement, and devoid of transparency—has been used as a pretextual tool to deny the Plaintiff equal access to a place of public accommodation on the basis of race and other protected classes. The denial of service to Mr. Williams was not the product of an isolated employee acting alone, but the direct result of a systemic failure by Family Dollar to oversee, regulate, and restrain discriminatory practices within its store locations. Through this negligence, it is alleged

21

that Family Dollar violated Title II of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans with Disabilities Act, the Illinois Human Rights Act, and Illinois common law doctrines protecting against negligent supervision and Intentional Infliction of Emotional distress. The enforcement of this policy against Mr. Williams, and not against others similarly situated, was grounded not in necessity but in bias—bias that Family Dollar has chosen to leave unchecked. The resulting injury to Mr. Williams was foreseeable, preventable, and rooted in Family Dollar's broader institutional failure to ensure that no customer is profiled, demeaned, or denied their rights under the law.

### A. Emotional and Psychological Injuries

#### 1. Humiliation and Shame

The Plaintiff suffered acute humiliation from being profiled as a suspected criminal, not based on conduct but on race and other protected classes—specifically, as a person from a class often unjustly associated with criminality. This treatment occurred while similarly situated individuals of different demographics were permitted to shop without interference.

#### 2. Emotional Distress from Discriminatory Targeting

The Plaintiff experienced significant emotional distress realizing that the policy was not being universally enforced, but instead applied in an arbitrary and biased manner. The discriminatory pretext behind the policy violated the Plaintiff's sense of fairness and dignity— it was discrimination— it was not right —and it was illegal, as alleged.

#### 3. Anxiety Triggered by Police Involvement

Being forced to interact with law enforcement, particularly as a member of a

22

demographic with statistically higher rates[5] of use-of-force encounters, triggered

heightened anxiety, fear, and concern for personal safety as described in paragraph 13

of this pleading.

### 4. Insomnia and Chronic Stress

As a result of the trauma, the Plaintiff suffered disrupted sleep, mental exhaustion,

and persistent stress, which negatively impacted his health and day-to-day

functioning.

### 5. Need for Mental Health Treatment

The cumulative psychological impact led the Plaintiff to seek therapeutic

intervention. This need for treatment is documented and attributable to the incident

and its aftermath. (Exhibit M)

### B. Loss of Access and Practical Hardships

### 6. Loss of Access to Local Store

Following the incident and issuance of a trespass order, the Plaintiff—who lacks

personal transportation—was denied access to the nearest Family Dollar, a store

previously within walking distance and vital to his needs.

### 7. Increased Burden to Secure Essentials

The Plaintiff had to travel significantly farther on foot to another retail location to

---

[5] See Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of being killed by police use of force in the United States by age, race–ethnicity, and sex*, 116 Proc. Nat'l Acad. Sci. 16793 (2019), https://www.pnas.org/doi/pdf/10.1073/pnas.1821204116; see also Jon Swaine et al., *Black Americans twice as likely as whites to face use or threat of force*, The Guardian (Nov. 14, 2015), https://www.theguardian.com/us-news/2015/nov/14/black-americans-twice-as-likely-as-whites-to-face-use-or-threat-non-fatal-police-force-us-study.

obtain essential items, creating hardship during a time when he was preparing for an important religious event.

### C. Financial Losses and Opportunity Costs

8. **Direct Out-of-Pocket Costs for Investigation and Advocacy**

To gather evidence and pursue redress, the Plaintiff incurred substantial personal expenses, including:

      i.     Payments to multiple mystery shoppers;

      ii.    Purchase of surveillance equipment;

     iii.   Rental of a vehicle for investigation and coordination;

     iv.   Notary services to validate shopper affidavits;

      v.    Gas reimbursements and orientation materials for participants.

     vi.   Miscellaneous

9. **Opportunity Cost in Time and Money**

The Plaintiff devoted extensive hours to researching the law, writing legal documents, and coordinating investigative work—time that otherwise could have been spent on professional pursuits or income-generating activities.

10. **Use of Trading Seed Capital**

Funds originally allocated for proprietary trading and financial advancement were redirected toward legal and investigatory expenses, resulting in lost investment opportunity and financial anxiety.

**11. Emotional Toll of Sacrificed Investment**

The Plaintiff experienced distress and despair from having to choose between seeking justice and growing his financial stability, ultimately feeling as if he may have sacrificed his future to fight a losing battle.

**D. Reputational and Dignitary Harm**

**12. Damage to Public Standing and Role as Minister**

The incident and its aftermath tarnished the Plaintiff's reputation, particularly as a religious leader and community figure. Being confronted by store staff and law enforcement undermined the respect and trust often accorded to someone in his role.

**13. Stigmatization from Internalized Bias**

The Plaintiff was further injured by overhearing a store employee—of his own racial background—state that "he watches Black guys when they come in here," reinforcing the damaging reality that racial profiling can be perpetuated by individuals within the same demographic. This caused emotional harm, frustration, and a deepened sense of systemic and internalized injustice.

38. Consumer profiling is a deeply rooted societal scourge—an invisible but crushing weight borne by countless individuals across this nation who often lack the voice, platform, or resources to confront the injustice inflicted upon them. It targets the vulnerable, silences the unheard, and normalizes the dehumanization of people based not on their actions, but on their appearance, identity, or perceived status. No member of our society should ever be subjected to the evil of discrimination—stripped of their dignity, presumed guilty without cause, and funneled toward law enforcement under the false premise of

suspicion, opening the door to further erosion of their rights and safety. This action is not only a plea for personal justice but a broader call to courageously reshape our shared values and build a more equitable society—one that actively facilitates human dignity and demands accountability from the powerful. In doing so, we must ensure that large corporations are not permitted to trample the civil rights of those least able to defend themselves. Real change requires practical solutions: injunctive relief to halt discriminatory practices, full restoration of justice to the harmed in terms of damages—both compensatory and punitive—delivered in the language corporations understand best: their bottom line. Only then can we send a clear, unwavering message that discrimination is not only morally unacceptable—it will not be tolerated under the law.

## CAUSES OF ACTION

### COUNT 1: Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a)

(Plaintiff v. FAMILY DOLLAR, LLC, & FAMILY DOLLAR STORES, LLC )

39. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

40. Plaintiff incorporates by reference Paragraph 11, which details his longstanding connection to the Calumet City community and his regular patronage of the Family Dollar store at 1775 Sibley Boulevard. These prior visits provided Plaintiff with personal knowledge of the store's environment and customer service patterns, including repeated observations of selective enforcement of the "bookbag" policy and disparate treatment of customers based on race and other protected classes as alleged.

41. The matter giving rise to this cause of action under Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a) occurred at a Family Dollar retail store located at 1775 Sibley

Boulevard, Calumet City, Illinois 60409. This location is the site where the discriminatory denial of full and equal enjoyment of the goods, services, and accommodations of a place of public accommodation was alleged to have taken place.

42. Although Family Dollar is not expressly listed among the enumerated categories of public accommodations under Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a), Plaintiff alleges that the store located at 1775 Sibley Boulevard, Calumet City, Illinois 60409 qualifies as a place of public accommodation within the meaning and intent of the statute.

43. Family Dollar is a retail establishment that is open to the general public, offers goods for sale to any consumer, and is part of a national chain engaged in interstate commerce through the distribution, sale, and marketing of consumer goods. Numerous federal courts have recognized that retail stores, although not explicitly named, may fall under the protections of Title II when they hold themselves out as serving the public and are integrally involved in commerce across state lines.

44. Therefore, based on its public-facing nature, commercial function, and interstate character, Family Dollar meets the criteria for classification as a place of public accommodation subject to the anti-discrimination provisions of Title II.

45. Furthermore, Defendant has previously acknowledged the existence and enforcement of customer-facing policies, such as its bookbag policy, "at some stores."[6] Plaintiff alleges that, when applied without clear guidelines or oversight, such policies carry a substantial risk of being enforced in a discriminatory manner against protected classes. In the context

---

[6] Dunn v. THE HUMAN RIGHTS COMMISSION, 2022 IL App (1st) 211156 - Ill: Appellate Court, 1st Dist., 4th Div. 2022

of a public-facing retail establishment, the existence and discretionary application of such policies further support the classification of Family Dollar as a place of public accommodation under Title II.

46. Plaintiff, Julius Williams, is an African American male and a member of one or more protected classes under Title II of the Civil Rights Act of 1964, including but not limited to race and color.

47. On or about March 8, 2025, Plaintiff entered the Family Dollar store located at 1775 Sibley Boulevard in Calumet City, Illinois, to purchase basic consumer goods.

48. Upon entry, a store employee denied Plaintiff service, stating that he was required to surrender his backpack before he could continue shopping, and ordered him to leave the premises.

49. Plaintiff alleges that this policy was not publicly posted, not applied uniformly, and that other customers—particularly White and female patrons—were routinely permitted to shop while wearing backpacks at this and other Family Dollar locations.

50. Plaintiff further alleges that Defendant had acknowledged the existence of this policy as early as 2022 at "some stores,"[7] indicating corporate awareness of its inconsistent enforcement across stores. The disparate application of the policy enterprise wide and at individual stores, coupled with Defendant's prior knowledge, supports a reasonable inference that Plaintiff was subjected to discriminatory treatment based on race, color and or other protected classes, in violation of federal law.

---

[7] Dunn v. THE HUMAN RIGHTS COMMISSION, 2022 IL App (1st) 211156 - Ill: Appellate Court, 1st Dist., 4th Div. 2022

51. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff was denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, in violation of 42 U.S.C. § 2000a.

52. Plaintiff alleges that Defendant knew or should have known that allowing store-level employees to enforce customer-facing policies, such as the "bookbag" policy, without adequate training, supervision, or uniform standards created a substantial and foreseeable risk of discriminatory application. Despite this knowledge, Defendant failed to take reasonable steps to prevent discriminatory enforcement, thereby exhibiting deliberate indifference to the civil rights of customers protected under federal law, including individuals of color. This indifference enabled and perpetuated a pattern of consumer profiling and unequal treatment, which culminated in the Plaintiff's exclusion from the store on March 8, 2025.

53. As a result of Defendant's conduct, Plaintiff experienced emotional distress, humiliation, and a deep sense of exclusion and fear—exacerbated by the public nature of being forcibly removed from a retail establishment while visibly a person of color and the subsequent involvement of law enforcement. In addition, Plaintiff incurred financial loss, including the time, effort, and personal resources devoted to confronting the injustice he suffered, investigating the discriminatory conduct, and advocating for accountability.

54. Plaintiff seeks all relief available under Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a), including declaratory relief, injunctive relief prohibiting continued discriminatory practices, and an order requiring Defendant to implement anti-

discrimination training and policy oversight measures designed to prevent consumer profiling and the pretextual or selective enforcement of customer-facing policies, including but not limited to any "bookbag" or similar policy. Plaintiff also seeks any other equitable relief the Court deems just and proper.

## COUNT 2: Civil Rights Act of 1866, as amended (42 U.S.C. § 1981)

(Plaintiff v. FAMILY DOLLAR, LLC, & FAMILY DOLLAR STORES, LLC )

55. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

56. Plaintiff incorporates by reference Paragraph 11, which details his longstanding connection to the Calumet City community and his regular patronage of the Family Dollar store at 1775 Sibley Boulevard. These prior visits provided Plaintiff with personal knowledge of the store's environment and customer service patterns, including repeated observations of selective enforcement of the "bookbag" policy and disparate treatment of customers based on race and gender.

57. 42 U.S.C. § 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. The statute prohibits racial discrimination in the formation, performance, modification, and termination of contracts, including the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

58. At all relevant times, Plaintiff, Julius Williams, is and was a Black male and a member of one or more protected classes under 42 U.S.C. § 1981, including race and color, which prohibit discrimination on the basis of both physical characteristics and pigmentation.

59. On or about March 8, 2025, Plaintiff entered the Family Dollar store located at 1775 Sibley Boulevard in Calumet City, Illinois, with the intent to purchase consumer goods— a contractual relationship protected under 42 U.S.C. § 1981. Upon entry, a store employee demanded that Plaintiff surrender his backpack as a condition of service. Plaintiff declined this discriminatorily applied condition, yet the employee ordered him to leave the premises, thereby unlawfully interfering with Plaintiff's right to make and enforce contracts on equal terms.

60. The store employee cited an alleged store policy, which was not publicly posted or uniformly enforced, as the basis for the demand. Plaintiff alleges that similarly situated non-Black customers—particularly White and female patrons—were routinely permitted to shop while wearing backpacks and were not subjected to the same restrictions, demonstrating selective and discriminatory enforcement of the policy.

61. Defendant, through its policies, practices, and failure to adequately train, supervise, and enforce uniform nondiscriminatory standards, had actual knowledge, or in the exercise of reasonable care should have known, that permitting discretionary enforcement of such customer-facing policies created a substantial risk of discriminatory application. Defendant's prior acknowledgment of the bookbag policy, including admissions of its existence and risks of selective enforcement, imposed a duty to implement effective oversight and training measures to prevent discrimination. Despite this, Defendant

31

deliberately disregarded this duty, exhibiting deliberate indifference to the rights of protected individuals and allowing ongoing discriminatory practices to persist.

62. As a direct and proximate result of Defendant's racially discriminatory conduct, Plaintiff was deprived of the right to contract on the same terms as white citizens in violation of 42 U.S.C. § 1981. Plaintiff experienced emotional distress, humiliation, and a deep sense of exclusion and fear—exacerbated by the public nature of being forcibly removed from a retail establishment while visibly a person of color and the subsequent involvement of law enforcement. In addition, Plaintiff incurred financial loss, including the time, effort, and personal resources devoted to confronting the injustice he suffered, investigating the discriminatory conduct, and advocating for accountability.

63. Plaintiff seeks all remedies available under 42 U.S.C. § 1981, including declaratory relief, compensatory damages, punitive damages, and attorney's fees (in the event Plaintiff retains counsel), as well as any other relief the Court deems just and proper.

**COUNT 3: Title III of the Americans with Disabilities Act (42 U.S.C. §§ 12181–12189)**

(Plaintiff, v. Family Dollar, LLC, & Family Dollar Stores, LLC)

64. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

65. Plaintiff incorporates by reference Paragraphs 7, 11, and 13, which together set forth Plaintiff's status as a person with a disability—namely, anxiety—as defined under the Americans with Disabilities Act (42 U.S.C. §□12102), his longstanding pattern of patronage at the Family Dollar store located at 1775 Sibley Boulevard, and the emotional

and physiological impact of the March 8, 2025 incident. Plaintiff relied on comfort items carried in his backpack to manage symptoms related to his condition.

66. On March 8, 2025, Defendants imposed a bookbag policy as a condition of entry, without accounting for Plaintiff's disability-related needs, resulting in the denial of full and equal access to the goods, services, and privileges of a place of public accommodation. Plaintiff further alleges that Defendants failed to provide reasonable accommodation and implemented the policy in a manner that was discriminatorily applied and insensitive to known or knowable disability-related considerations.

67. As detailed in Paragraph 13, the denial of access triggered an acute anxiety episode that required Plaintiff to retrieve and use tools from his backpack to self-regulate. This discriminatory treatment based on disability, and Defendants' failure to provide reasonable accommodations, constitutes a violation of Title III of the Americans with Disabilities Act (42 U.S.C. §§ 12181–12189).

68. As a direct and proximate result of Defendants' discriminatory conduct and failure to reasonably accommodate Plaintiff's disability, Plaintiff suffered emotional distress, humiliation, and a heightened anxiety episode requiring immediate self-regulation. The incident caused Plaintiff to feel excluded, unsafe, and unreasonably targeted in a public setting, exacerbating his existing disability. Plaintiff also incurred personal and financial costs associated with addressing the harm, including time, emotional energy, and other resources used to advocate for his rights.

69. Plaintiff further alleges that Defendants, through corporate management and supervisory channels, failed to adequately train, supervise, or monitor store-level employees regarding their legal obligations under the Americans with Disabilities Act. Despite the

foreseeable risk that customer-facing policies—such as the bookbag policy—could be discriminatorily applied or result in the denial of reasonable accommodation, Defendants failed to implement safeguards, oversight, or clear accommodation protocols. This failure constitutes negligent supervision and reflects deliberate indifference to the rights of individuals with disabilities.

70. Plaintiff seeks all remedies available under Title III of the Americans with Disabilities Act (42 U.S.C. §§ 12181–12189), including declaratory relief, injunctive relief requiring Defendants to revise and properly implement customer-facing policies in a manner that accommodates disabilities, staff training to prevent discriminatory application of such policies, and any other relief the Court deems just and proper.

## COUNT 4: Negligent Supervision (Illinois Common Law Tort)

### (Plaintiff v. FAMILY DOLLAR, LLC, & FAMILY DOLLAR STORES, LLC)

71. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

72. Plaintiff incorporates by reference Paragraphs 11, 12, and 13, which describe Plaintiff's prior experiences with the store's environment and racial profiling (¶ 11), the facts of the March 8, 2025 incident and the denial of public accommodation (¶ 12), and the resulting emotional and physiological impact of the discriminatory treatment, including Plaintiff's anxiety episode (¶ 13)."

73. As further set forth in Paragraphs 23 through 27, Defendants had actual or constructive knowledge of prior incidents, public settlements, and judicial acknowledgments concerning the discriminatory application of their bag-check and backpack policies, including a public accommodation settlement in Des Moines, Iowa and the appellate

34

matter of Zsoch Dunn v. Illinois Human Rights Commission, 2022 IL App (1st) 211156-U. These facts underscore Defendants' duty to train and supervise employees to prevent the pretextual or selectively enforced policy and denial of service to protected classes.

74. Under Illinois common law, an employer is liable for negligent supervision where it knew or should have known that an employee's conduct posed a risk of harm, yet failed to take reasonable steps to prevent that harm. Defendants breached this duty by failing to provide adequate supervision, oversight, or training to prevent the discriminatory or inconsistent enforcement of store policies that disproportionately affected customers based on race, color, gender, or disability.

75. Defendants' failure to monitor the conduct of their store personnel, ensure uniform policy enforcement, and act on prior complaints and public findings of similar misconduct constitutes negligence. This negligent supervision foreseeably resulted in the discriminatory treatment Plaintiff experienced on March 8, 2025.

76. As a direct and proximate result of Defendants' negligent supervision, Plaintiff was subjected to racial, sex and disability-based discrimination, denied access to public accommodations, experienced severe emotional distress, and incurred financial loss in the form of time, effort, and resources expended in investigating and responding to the incident.

77. Defendants' conduct further demonstrated a willful and wanton disregard for the rights and safety of individuals protected under civil rights laws, justifying the imposition of punitive damages.

78. Plaintiff seeks all damages available under Illinois law for negligent supervision, including compensatory damages for emotional distress and economic loss, and punitive damages that reflect the seriousness of Defendants' reckless disregard for civil rights. This case is not merely about a customer denied service — it is about the persistent, unchecked profiling of individuals based on race color and other protected classes, and the failure of a national corporation to take responsibility for a pattern of discriminatory conduct it knew or should have known was occurring.

79. This kind of consumer profiling does not happen in isolation; it flourishes in environments where corporate leadership turns a blind eye to warning signs and leaves frontline workers untrained, unsupervised, and emboldened to act on bias. Family Dollar's conduct speaks not only to negligence, but to a systemic indifference to the humanity of its customers — particularly those who are already among society's most vulnerable. Discrimination at the door of a store is not just a bad policy; it is a denial of dignity and a betrayal of the promise that public accommodations are open to all.

80. Plaintiff therefore urges this Court to award punitive damages not only to redress the personal harm suffered, but to send a resolute message — that the abuse of civil rights in the marketplace will carry meaningful consequences. Only through the language of financial accountability can corporations like Family Dollar be compelled to treat civil rights as a matter of corporate priority, rather than public relations. The bottom line must reflect that discrimination is not just morally reprehensible — it is legally intolerable and economically unsustainable.

**COUNT 5: Intentional Infliction of Emotional Distress (Illinois Common Law Tort)**

(Plaintiff v. FAMILY DOLLAR, LLC & FAMILY DOLLAR STORES, LLC)

36

81. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

82. Plaintiff incorporates by reference Paragraphs 11, 12, and 13, which describe Plaintiff's history with the Family Dollar store at 1775 Sibley Blvd., the March 8, 2025 incident involving the discriminatorily applied backpack policy, and the resulting emotional and physiological effects—including Plaintiff's acute anxiety episode, physical shaking, and fear of police confrontation.

83. Defendants' conduct—publicly singling out Plaintiff, a visibly African American male, for exclusion under a selectively applied and pretextual store policy—was extreme and outrageous. The cashier's decision to impose a discretionary and discriminatorily enforced policy, followed by an immediate call to law enforcement despite Plaintiff's peaceful demeanor, was not merely negligent or inconsiderate, but reckless and indifferent to the predictable emotional consequences of such actions on a member of a historically profiled group.

84. Defendants knew or should have known, especially in light of Family Dollar's past involvement in civil rights complaints and settlements regarding racially charged consumer profiling, that their conduct would likely cause serious emotional harm. Despite this, Defendants took no meaningful steps to train or supervise their employees in avoiding race, color, sex and disability-based targeting.

85. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, including but not limited to: humiliation, emotional pain, anxiety attacks, fear of wrongful police confrontation, and a deepened sense of exclusion and degradation. Plaintiff experienced visible physical symptoms including trembling,

elevated heart rate, and required immediate reliance on self-help tools to avoid further psychological deterioration.

86. The distress endured by Plaintiff was not fleeting or minimal—it was profound, humiliating, and disruptive, impacting his mental and emotional well-being. No reasonable person should be expected to endure such treatment in a public commercial setting.

87. Plaintiff seeks compensatory and punitive damages for the intentional or recklessly indifferent infliction of emotional distress, in an amount to be determined by the Court or jury.

**COUNT 6: Equitable Relief to Preserve Jurisdiction and Prevent Irreparable Harm**
**(Request for Temporary Restraining Order and Preliminary Injunction)**

(Plaintiff v. Dollar Tree, Inc.)

88. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

89. On information and belief, Dollar Tree, Inc., the parent company of Family Dollar, LLC and Family Dollar Stores, LLC, is currently engaged in an agreement to divest the Family Dollar business segment to private equity firms Brigade Capital Management, LP and Macellum Capital Management, LLC for approximately $1 billion—a transaction anticipated to close in the second quarter of 2025 . Unless enjoined, Dollar Tree may transfer, restructure, or otherwise dissipate Family Dollar assets to those parties or any other party, thereby frustrating the Court's ability to render meaningful relief in this litigation.

90. Plaintiff alleges that absent an immediate Temporary Restraining Order and Preliminary Injunction, Dollar☐Tree is likely to complete the divestiture transaction, resulting in the transfer of assets and corporate control of Family☐Dollar, dissolution of subsidiary entities, or significant restructuring—any of which may render Plaintiff's claims uncollectible and equitable relief unattainable.

91. Plaintiff has demonstrated a likelihood of success on the merits under multiple causes of action, including violations of Titles II of the Civil Rights Act 1964,, Title III of The Americans with Disabilities Act, 42 U.S.C. §☐1981, and Illinois tort laws.

92. Plaintiff will suffer irreparable injury if an injunction is not issued, as the proposed divestiture threatens the permanent loss of jurisdiction and the Court's ability to enforce its orders—particularly equitable mandates regarding training, policy reforms, and injunctive relief.

93. The balance of equities and public interest favor an injunction, as preventing asset dissipation and preserving judicial authority aligns with public policy and the fair administration of justice.

94. Plaintiff respectfully requests that this Court promptly issue a Temporary Restraining Order and, subsequently, a Preliminary Injunction:

    A.    Prohibiting Dollar☐Tree,☐Inc., its subsidiaries, agents, or assigns, from completing any sale, divestiture, restructuring, dissolution, or material transfer of Family☐Dollar,☐LLC or Family☐Dollar☐Stores,☐LLC;

    B.    Requiring Defendants to preserve all relevant documents, assets, records, and communications pertaining to Family☐Dollar and the proposed transaction;

C.     Granting any further equitable relief necessary to maintain the Court's
       jurisdiction and ensure complete remediation of Plaintiff's claims.

**PROSPECTIVE COUNT: Illinois Human Rights Act (775 ILCS 5/1-101 et seq.)**

95. Plaintiff has filed a Charge of Discrimination with the Illinois Department of Human
    Rights (IDHR), asserting that the conduct described herein also constitutes unlawful
    discrimination based on race, color, sex, and disability in violation of the Illinois Human
    Rights Act (775 ILCS 5/1-101 et seq.). Exhibit I

96. Upon receiving a Notice of Right to Sue from the IDHR or Illinois Human Rights
    Commission, Plaintiff intends to amend this Complaint to formally assert a cause of
    action under the Illinois Human Rights Act.

97. Plaintiff incorporates all relevant factual allegations previously set forth herein and states
    that the discriminatory denial of public accommodation, profiling based on protected
    characteristics, and failure to reasonably accommodate Plaintiff's disability are violations
    of Sections 5-101(A)(1), 5-102, and 5-103 of the Act.

98. Plaintiff respectfully notifies the Court and all parties that this future claim is being
    preserved to ensure continuity of litigation upon exhaustion of administrative remedies,
    and seeks leave to amend the Complaint accordingly at the appropriate time.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and

against Defendants FAMILY DOLLAR, LLC, FAMILY DOLLAR STORES, LLC, and

DOLLAR TREE, INC., and award the following relief:

40

1. **Declaratory Relief**: A declaration that the actions of Defendants described herein violated Plaintiff's rights under Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a), the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Americans with Disabilities Act (42 U.S.C. §§ 12181–12189), and Illinois common law torts, including Negligent Supervision and Intentional Infliction of Emotional Distress;

2. **Injunctive Relief**:

   o An order requiring Defendants to revise and enforce all customer-facing policies (including any "bookbag" or "backpack" policies) to ensure compliance with federal and state anti-discrimination laws;

   o Mandatory anti-discrimination training for all store personnel;

   o Oversight mechanisms to ensure uniform and lawful application of store policies;

   o An order prohibiting DOLLAR TREE, INC. from consummating the divestiture, dissolution, or transfer of FAMILY DOLLAR, LLC or its assets to any private equity firm or third-party acquirer until the conclusion of this litigation or further order of this Court;

3. **Compensatory Damages**: An award of compensatory damages in an amount not less than **Five Million Dollars ($5,000,000)** for the emotional distress, humiliation, reputational harm, and economic losses caused by Defendants' conduct;

4. **Punitive Damages**: An award of punitive damages in an amount not less than **Ten Million Dollars ($10,000,000)** to punish Defendants for willful and wanton misconduct, reckless disregard of civil rights, and systemic failure to prevent discriminatory conduct, and to deter similar misconduct by corporate actors in the future;

41

5. **Attorney's Fees and Costs**: An award of costs of litigation and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 (for the § 1981 claim), the ADA, and as otherwise authorized by law;

6. **Temporary and Preliminary Injunctive Relief**: An award of temporary and preliminary injunctive relief enjoining DOLLAR TREE, INC. and its agents from proceeding with the divestiture, sale, dissolution, or transfer of FAMILY DOLLAR, LLC or its assets to any private equity firm or third party, including but not limited to Sycamore Partners (or any successor acquirer), **until the conclusion of this litigation or further order of this Court**, to prevent the dissipation of assets or other actions that would frustrate the Court's ability to award complete relief.

7. **Any Other Relief**: Such other and further relief as the Court deems just, equitable, and appropriate.

**Total Monetary Relief Requested: Fifteen Million Dollars ($15,000,000)**, plus equitable, declaratory, and injunctive relief.

Respectfully submitted,

Julius C. Williams

Pro Se Plaintiff

500 Manistee Avenue

Calumet City, Illinois 60409

(773) 621-2889

Julius.Excellence01@gmail.com

Date:

June 30th, 2025

| Exhibits | Description |
| --- | --- |
| Exhibit A | Police Cam Video |
| Exhibit B | Transcript of Police Cam Video |
| Exhibit C | Mystery Shop Questionnaire – African American Male |
| Exhibit D | Mystery Shop Video – African American Male |
| Exhibit E | Mystery Shop Questionnaire – Asian-Mongolian Male |
| Exhibit F | Mystery Shop Video – Asian-Mongolian Male |
| Exhibit G | Mystery Shop Questionnaire – Indian Male |
| Exhibit H | Mystery Shop Video – Indian Male |
| Exhibit I | Mystery Shop Questionnaire – White & Brazilian Female |
| Exhibit J | Mystery Shop Video – White & Brazilian Female |
| Exhibit K | Mystery Shop Questionnaire – White & Filipina Female |
| Exhibit L | Mystery Shop Video – White & Filipina Female |
| Exhibit M | Proof of Therapy |

# EXHIBIT A
## (Police Cam Video)

# EXHIBIT B
## (Police Cam Transcript)

# EXHIBIT C
# (Mystery Shop Questionnaire African American Male)

# EXHIBIT D
# (Mystery Shop Video, African American Male)

# EXHIBIT E
# (Mystery Shop Questionnaire, Asian-Mongolian Male)

# EXHIBIT F
# (Mystery Shop Video, Asian-Mongolian Male)

# EXHIBIT G
## (Mystery Shop Questionnaire, Indian Male)

# EXHIBIT H
## (Mystery Shop Video, Indian Male)

# EXHIBIT I
# (Mystery Shop Questionnaire, White & Brazilian Female)

# EXHIBIT J
# (Mystery Shop Video, White & Brazilian Female)

# EXHIBIT K
## (Mystery Shop Questionnaire, White & Filipina Female)

# EXHIBIT L
# (Mystery Shop Video, White & Filipina Female)

# EXHIBIT M
# (Proof of Therapy)